*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

### ENTRY ORDER

SUPREME COURT DOCKET NO. 2015-205

NOVEMBER TERM, 2015

| | |
|---|---|
| In re Gregory Hovey Act 250 Permit (Robert and Toni Flanigan, Appellants) | } APPEALED FROM: } } Superior Court, } Environmental Division } } DOCKET NO. 130-9-13 Vtec |

Trial Judge: Thomas G. Walsh

In the above-entitled cause, the Clerk will enter:

Neighbors Robert and Toni Flanigan appeal from the trial court's order granting an Act 250 permit to applicant Gregory Hovey. Applicant cross-appeals. We affirm.

In September 2013, the local district environmental commission granted applicant an after-the-fact Act 250 permit to construct and operate a dog breeding facility on his 10.4 acre property. The permit restricts the project to 50 dogs. The Flanigans appealed to the Environmental Division, arguing that the noise associated with the project would have an undue adverse impact. Following a site visit and a bench trial, the court upheld the issuance of the permit and added a condition related to noise. During the court's site visit, applicant had 41 dogs, either beagles or labrador retrievers. At the time of the Flanigans' noise monitoring in June 2014, applicant had 23 dogs.

The court found the following. Applicant lives in a rural area. His immediate neighbors to the north, the Duanes, did not participate in the appeal. The neighbor north of the Duanes cannot hear the project dogs barking when his windows and doors are closed, and generally does not hear dogs barking when he drives by applicant's property. The Flanigans own a home south of applicant's property. Their house is located approximately 150 yards from the project, with a 70 yard buffer of wooded land between their house and the project. The MacDonald/Loomis family lives to the south of the Flanigans, and they have two labrador retrievers. Ryan Hovey lives south of the MacDonald/Loomis property, and appropriately 1000 feet south of the Flanigans' southern property boundary. Ryan Hovey runs a dog kennel. In June 2014, he had 19 labrador retrievers, and at the time of the merits hearing, he had 5. Skip Easter lives south of Ryan Hovey and approximately one half mile from the project. He provides a foster home for dogs, and has up to 5 dogs at a time. His dogs bark when they are outside or when someone comes to visit. He hears other dogs in the neighborhood, including the project dogs. Skip Easter and Fern Loomis testified that they cannot hear Ryan Hovey's labs bark but they can hear Greg Hovey's beagles bark. Ruth Neborsky lives south of the Easter property. She has one dog and occasionally hears dogs barking from other properties.

The court found that the project dogs were well-managed, which limited their barking. Applicant fed and watered the dogs at regular hours and in a time-limiting fashion. He fed the dogs early in the morning and provided water at nighttime. He cleaned the kennels once a day in the early afternoon. The dogs had adequate space in the kennels and the beagles were exercised weekly in field training. Applicant used electronic collars to control excessive barking. He had also planted 155 forsythia plants around the perimeter of the kennels.

A Vermont Natural Resources (NRB) compliance investigator conducted an unannounced site inspection of the project in January 2014. He heard no dog barking when he drove to the site, exited his car, and first entered the property. When he approached within 25 feet of the kennels, the labs barked but the beagles did not. When the investigator turned away from the kennels, the dogs immediately stopped barking.

The Flanigans retained an expert who collected noise and wind data over a ten-day period in mid-June 2014. Noise monitoring equipment was placed in the Flanigans' northern yard, 10 yards south of the tree line and 5 yards north of the house. The court found that during the 10-day period, there were 76 incidents of dog barking. The barking events lasted from 4 to 60 minutes, with durations averaging between 4 to 21 minutes. Daytime and nighttime maximum sound levels were recorded on June 20, 2014 at 6:58 p.m. and 7:40 p.m. as 64 and 62 decibels (dBA), respectively.

Based on these findings, the court evaluated the impact of the noise under Criterion 8 of Act 250. Applying the Quechee test, the court considered if the project would have an adverse aesthetic impact and, if so, whether that impact would be undue. See In re Quechee Lakes Corp., Nos. 3W0411–EB, 3W0439–EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985), http://www.nrb.state.vt.us/lup/decisions.htm.[*] In its consideration, the court assigned the burden of proof to the parties opposing the application on the basis of Criterion 8. See 10 V.S.A. § 6088(b) (placing ultimate burden of showing project failed Criterion 8 on project's opponents).

The court concluded that the project would have an adverse impact, weighing the following factors collectively: the nature of the project's surroundings, the compatibility of the project's design with those surroundings, and the locations from which the project can be heard. The court explained that the project was in a rural area, located off of an unpaved secondary road. The closest residence was approximately 150 yards from the project, separated by approximately 70 yards of trees. The ambient sound level was 24 to 25 dBA. The court reasoned that while a bark, and intermittent barking, did not represent a significant departure from existing land uses in the area, the project itself did not fit the context of the rural neighborhood. It concluded that adding a dog kennel with a maximum of 50 dogs would produce an adverse effect on the area under Criterion 8. It cited John and Joyce Belter, No. 4C0643-6R-EB, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. May 28, 1991), as support for its conclusion. It noted that the Board there concluded that additional drilling and blasting would be more than the neighborhood was already used to on a regular basis, and thus, the noise would have an adverse effect on aesthetics.

---

[*] The court also considered whether the project would result in undue air pollution as it relates to noise under Act 250 Criterion 1. The Flanigans do not appeal the court's ruling that it would not.

Having found an adverse aesthetic impact, the court next considered whether the impact would be undue. As relevant here, an impact is undue if "it offends the sensibilities of the average person" or if the applicant has "failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 74 (quotation and brackets omitted). The court concluded that adding additional intermittent dog barking to the area was not "shocking or offensive to the average person," particularly as the residents were used to hearing sporadic dog barking noise from other residential properties in the area, including another dog kennel. The court noted that the intermittency and duration of the noise was more significant than its decibel level. The Flanigans' noise study showed an average of 8 instances of barking per day, with a typical duration of between 4 and 21 minutes, although one event lasted for 60 minutes. The maximum decibel level was recorded on single day. There was no indication that these barking events lasted for a prolonged period or that similar barking events at similar times occurred on other dates. Additionally, although the Flanigans and other neighbors testified to loud dog barking noises at night, even to the degree of waking them up, there was no noise data offered to support nighttime barking of this nature. The court did not credit testimony by Skip Easter and Fern Loomis that, even though Ryan Hovey's kennel was much closer to them, they could not hear Ryan Hovey's labs but they could hear applicant's beagles. The court found that these statements went against reason and were not supported by credible data, and thus did not afford the testimony much weight. The court concluded that the project did not offend the sensibilities of the average person and it was not out of character with its surroundings.

Turning to mitigating steps, the court noted that applicant prepared food ahead of time to shorten his time at the kennel during feeding. He fed the dogs early in the morning and provided water at night, he cleaned the kennels once a day in early afternoon, and he used electronic collars, all of which helped to control excessive barking. Applicant had also planted forsythias, which over time might serve to reduce the noise of dogs barking. All of these measures reduced barking events and duration, and mitigated noise impacts. Considering the evidence as a whole, including both the type and frequency of noise the project would generate and the neighboring land uses, the court concluded that the proposed project, as conditioned, would not have an undue adverse effect on the character of the area. It reached this conclusion because the Flanigans had not provided evidence of noise levels or other data demonstrating that noise levels from the project created an undue adverse aesthetic impact. See 10 V.S.A. § 6088(b).

In reaching its conclusion, the court considered prior Act 250 decisions which set a decibel limit on proposed projects of 55 dBA at surrounding residences and outside areas of frequent human uses and 70 dBA at the property line. The court explained that these noise limits were typically established for commercial or industrial operations, where the noise was more regular in duration than intermittent dog barking. In this case, there was a limit to the level of noise that dog barking created. Thus, setting a maximum noise level was less important than regulating the duration and frequency of barking. Thus, to ensure that the project did not result in an undue adverse impact from noise, the court imposed the following condition: "Prolonged barking at the dog kennel shall be prohibited. Prolonged barking is considered to be sustained barking for one hour or more during the daytime or sustained barking for 30 minutes or more during the nighttime."

The Natural Resources Board (NRB) filed a motion to amend. It asked the court, among other things, to clarify what constituted "sustained barking." The NRB suggested that the court

3

adopt a 90-second maximum break between sound events to avoid any disputes. The court declined to adopt a set time interval as a definition for "sustained barking." It reiterated that intermittent dog barking was not uncharacteristic in the area, and that the potential adverse impacts of the project related more to the frequency and duration of the noise than to the maximum level of noise created. It had thus designed a condition to prevent noise events that were both adverse to the character of the area and irritating and disruptive to the surrounding residents. The court concluded that establishing a set interval of time between barks would not serve this purpose, and that certain intervals of barking might be irritating to one person without being out of character with a given area. The court concluded that for enforcement purposes, the words must be given their ordinary meaning, and that flexibility was required.

In response to a request for more precise definition of "barking," the court indicated that its condition applies to all "canine vocalization," thus ensuring that "howling" is included.

Finally, the court rejected the Flanigans' request to impose a maximum noise limit, and it denied applicant's request to clarify that there was a maximum noise level of 70 dBA. For the reasons detailed in its earlier decision, the court declined to further alter its findings or condition, and it clarified that barking, even if below 70 dBA at the property line, would violate the condition if the barking was sustained. The evidence showed that the highest maximum sound measured during the noise study was 64 dBA, and these short instantaneous noises were not of a level that could potentially create undue air pollution. Additionally, the potential aesthetic impacts recognized by the court did not relate to the specific volume of the noise, but rather, the frequency and duration of the noise. The Flanigans appealed from the court's decision, and applicant cross-appealed.

We begin with applicant's cross-appeal. Applicant argues that the court's findings do not support its conclusion that the project would have an adverse effect on the area. He maintains that the project does fit in with the character of the neighborhood given the number of dogs in the area and the fact that his dogs are well-managed, which limits their barking. Applicant also asserts that the case cited by the court in support of its decision is inapposite.

"[O]ur evaluation of this claim . . . is limited by our standard of review." In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 75. We leave it to the environmental court "to weigh the evidence and assess the credibility of the witnesses with respect to [the impacts of a project], and we will uphold the court's conclusions so long as it has not abused its discretion." Id. (citation omitted). "The court's conclusions, however, must be supported by the factual findings." Id.

We find no abuse of discretion here. The court recognized that there were other dogs in the area, including another dog kennel and a foster home for dogs. Nonetheless, it concluded that adding up to fifty more dogs to this rural residential neighborhood would create an adverse effect. This decision reflects the court's assessment of the weight of the evidence, and it rests well within the court's discretion. The court did not misconstrue John and Joyce Belter, No. 4C0643-6R-EB, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. May 28, 1991), as applicant asserts. While it is true that the noise at issue in that case was of a much different character, the case supports the basic proposition that there is a point at which the noise associated with a proposed project becomes more than residents are used to hearing on a regular basis, and the effect is therefore adverse. The court found that point had been reached here, and it did not err in doing so.

4

We thus turn to the Flanigans' arguments. They argue that the court erred in finding no undue adverse impact because the project "offends the sensibilities of the average person." In particular, they take issue with the court's reliance on the presence of other dogs in the neighborhood, and argue that the court failed to take into account that most of the dogs at the other kennel were puppies, and the dogs in nearby foster care were small dogs that made "yipping" noises distinct from the barking of a larger dog like a Labrador retriever or beagle. They fault the court for not setting decibel limits; for rejecting the neighbors' testimony that barking from the project has awakened them when these claims were corroborated, in neighbors' view, by the decibel testing they supplied the court; and for dismissing the testimony by some neighbors that they can distinguish the barking from the project and the other nearby kennel. They contest the court's suggestion that the project is not truly a commercial operation like a gravel pit, and they dispute the trial court's conclusion that the barking was not unduly protracted or frequent.

We find no error. The Flanigans essentially challenge the court's assessment of the weight of the evidence and the credibility of witnesses, matters reserved to the trial court. The court could properly consider that there were other dogs, including a dog kennel, in the area. The court was within its discretion in concluding that dog barking of the frequency, duration and volume reflected by the evidence was annoying, but would not disrupt day-to-day living to the level that was shocking and offensive to the average person. Moreover, the court imposed a condition designed to address the most annoying aspects of the barking. The court was within its discretion in declining to credit testimony from neighbors that loud barking woke them up at night, finding it unsupported by the noise study. The Flanigans' noise study showed that the loudest barking was on one particular day at approximately 7 p.m. and 7:40 p.m., which is considered "daytime" pursuant to the court's order. Likewise, it was reasonable for the court not to credit testimony by two neighbors that they could not hear barking from the kennel closest to them but could hear barking from the project kennel much farther away. While the Flanigans disagree with the court's conclusions, including the level of noise generated by a dog kennel, they fail to show any clear error or abuse of discretion. See Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571 (explaining that arguments which amount to nothing more than a disagreement with court's reasoning and conclusion do not make out a case for an abuse of discretion).

The Flanigans also challenge the court's assessment of whether applicant took "generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." They assert that the court failed to make an express finding on this point, and that the court should have found that the mitigation measures they proposed—relocating the kennel, housing the dogs inside at night, and constructing a sound barrier—were "generally available." The Flanigans also contend that the court ignored uncontested expert testimony that the forsythia shrubs would not meaningfully mitigate the noise as well as applicant's admission that he seldom used the electronic collars.

Again, we find no error. The court recognized that the Flanigans had the ultimate burden of showing that the project failed to comply with Criterion 8, 10 V.S.A. § 6088(b), and it concluded that they failed to meet that burden here. The court noted all of the mitigating steps taken by applicant, which served to reduce barking events and durations and mitigate noise impacts. It imposed a condition to protect neighbors against long and frequent barking events. While the Flanigans suggest applicant could have located the kennel elsewhere, they provided no specific evidence at trial to support this contention. While they do not provide any citation to the trial transcript, the testimony on this point appears to consist of one sentence. The person who

5

conducted the noise study for the Flanigans agreed that it was possible that relocating the kennel to a portion of the property farther away from them could reduce the impact of the noise. He provided no specific information beyond this assertion. This type of evidence is insufficient to show that applicant failed to take generally available mitigating steps. See In re Goddard Coll. Conditional Use, 2014 VT 124, ¶ 12 (rejecting argument that trial court erred by failing to review all mitigating steps, including possible relocation, before granting Act 250 permit where neighbors put forth almost no competent evidence on the issue of alternative siting). As repeatedly stated, the court found that the volume of the barking was not the issue in this case. It rejected the notion that the dogs engaged in loud nighttime barking that woke up neighbors, and thus, there was no need to house the dogs inside at night. The court recognized that the forsythia shrubs were still immature, and indicated that over time, they might serve to reduce the sound of dogs barking. As to the electronic collars, applicant testified that he does use them, but that he does not need to use them very often because there is not a lot of barking. The court's conclusion that the Flanigans failed to produce persuasive evidence that noise from the project created an undue adverse aesthetic impact was within the court's discretion and supported by sufficient evidence.

Finally, the Flanigans and applicant challenge the noise condition imposed by the court, albeit for different reasons.

Applicant argues that the court's noise condition is vague and difficult to measure. Given the number of dogs in the area, it will be difficult to determine whose dogs may or may not have been barking, and determining whether "canine vocalization" is sustained will be difficult to measure. Applicant notes that the vague standard creates particular problems in the context of the ongoing disputes between the neighbors. Finally, applicant notes that the court found no undue adverse effect, thus suggesting that no condition was necessary.

The court concluded that there was no undue adverse effect with the project, subject to this condition. The implication is that without the condition the adverse effect of the project might be undue. Applicant's point that the standard adopted by the court may be difficult to enforce, and may lead to further litigation, is not unreasonable. But the court provided a cogent explanation as to why a more precise standard would fail to guard against the harm the condition seeks to prevent. Under these circumstances, we conclude that the court's framing of the condition is within its discretion.

The Flanigans assert that the condition is overly vague, impracticable, logically inconsistent, and incompatible with Act 250 precedents. Specifically, they note that prior Environmental Board cases had established a standard of 70 dBA at the property line and 55 dBA at the nearest place of regular human activity during the day and 45 dBA at night as indices of an undue adverse effect from noise. They argued that the court's ruling below incongruously retained the 70 dBA limit at the property line that had been included as an original permit condition, but declined to apply the limit of 55 dBA at the nearest place of regular human activity. They further contend, as did applicant, that the court should have precisely defined "sustained canine vocalization" because its framing of the condition fails to put the parties on notice of what, precisely, will constitute a violation.

With respect to the first argument, this court has recognized that "the Environmental Board formulated a standard for determining at what point a noise event is adverse: where the noise exceeds 70 dBA (Lmax) at the property line and 55 dBA (Lmax) at surrounding residences

and outside areas of frequent human use.  In re Application of Lathrop Ltd. P'ship, 2015 VT 49, ¶ 80.  However, we have also cautioned that "the standard should not be applied rigidly."  Id. ¶ 81.  Instead, "the context and setting of a project should aid in dictating the appropriate noise levels."  Id.  The court provided specific reasons for declining to institute a specific decibel level here.  The duration of intermittent dog barking is less regular than the noise associated with typical commercial or industrial operations like quarrying.  Moreover, the volume of a dog's bark is limited.  Under these circumstances, the court concluded that a condition that regulated the frequency and duration of barking was more important than one regulating the volume of the barking.  The court's decision to not set a volume limit operates to the Flanigans' benefit insofar as the court has established that barking of sufficient frequency and duration may violate the permit condition even if the decibel level of the barking does not rise to the 70 dBA level.  The court has more than adequately explained its decision not to apply the 55 dBA limit as a permit condition in this case, and its decision on that point is within its discretion.

With respect to the vagueness of the court's condition—an issue raised by both parties on appeal and cross-appeal, for the reasons noted above we conclude that the court did not abuse its discretion in determining that the definition of sustained canine vocalization must remain flexible.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice